MEMORANDUM
 

 DALZELL, District Judge.
 

 Plaintiffs Amco Ukrserviee and Prom-priladamco are Ukrainian corporations seeking over $200 million in damages for the breach of two joint venture agreements that, they contend, obligated defendant American Meter Company to provide them with all of the gas meters and related piping they could sell in republics of the former Soviet Union.
 

 After extensive discovery, American Meter and Prompriladamco filed the cross-motions for summary judgment now before us. American Meter asserts that it is entitled to judgment against both plaintiffs as a matter of law because the joint venture agreements are unenforceable under both the United Nations Convention on Contracts for the International Sale of Goods (“CISG”) and Ukrainian commercial law. Prompriladamco claims that its agreement is enforceable, that there is no genuine issue of material fact as to whether American Meter is in breach of that agreement, and that the only remaining issue is the extent of the damages it has sustained.
 

 Upon consideration of this complex web of law, we conclude that American Meter is not entitled to summary judgment because the CISG does not apply to the joint venture agreements and because, under Pennsylvania’s choice of law regime, Pennsylvania law, and not Ukrainian law, governs the plaintiffs’ claims. We further find that Prompriladamco is not entitled to summary judgment on the liability issue because there remains a genuine issue of material fact as to whether C. Douglas Prendergast, the American Meter employee who signed the Prompriladamco joint venture agreement, had actual or apparent authority to make the momentous commitments on the corporation’s behalf that have occasioned this suit.
 

 I.
 
 Factual and Procedural History
 

 The origins of this action lie in the collapse of the Soviet Union and the newly-independent Ukraine’s fitful transition to a market economy. American Meter began to explore the possibility of selling its products in the former Soviet Union in the early 1990s, and in 1992 it named Prender-gast as Director of Operations of C.I.S. [Commonwealth of Independent States]
 
 *DCCXXVI
 
 Projects.
 
 See
 
 Pl.’s Reply (Pl.’s Mot. S.J.) Ex. A. Sometime in 1996, a Ukrainian-born American citizen named Simon Friedman approached Prendergast about the possibility of marketing American Meter products in Ukraine.
 

 Ukraine was a potentially appealing market for American Meter at that time. During and immediately after the Soviet era, Ukrainian utilities had not charged consumers for their actual consumption of natural gas but instead had allocated charges on the basis of total deliveries to a given area. That system penalized consumers for their neighbors’ wastefulness and saddled them with the cost of leakage losses. In 1997, the Ukrainian government enacted legislation requiring utilities to shift toward a usage-based billing system. Prendergast’s early prediction was that implementation of the legislation would require the installation of gas meters in millions of homes and apartment buildings.
 
 See
 
 Mem. from Prendergast to Skilton of 11/10/97, at 1-2 (Pis.’ Resp. (Def.’s Mot. S.J.) Ex. 22).
 

 After some investigation, Prendergast and his superiors at American Meter concluded they could best penetrate the Ukrainian market by forming a joint venture with a local manufacturer. To this end, American Meter Vice-President Andrew Watson authorized Friedman
 
 [1]
 
 on June 24, 1997 to engage in discussions and negotiations with Ukrainian organizations, and the corporation also hired a former vice-president, Peter Russo, to consult on the project. Mandate of 6/24/97 (Pis.’ Resp. (Def.’s Mot. S.J.) Ex. 14); Russo Dep. at 9 (Pis.’ Resp. (Def.’s Mot. S.J.) Ex. 7). Prendergast, Russo, and Friedman began to identify potential joint venture partners, and by late 1997, they had selected Promprilad, a Ukrainian manufacturer of commercial and industrial meters based in Ivano-Frankivsk, the industrial capital of western Ukraine. On December 11, 1997, Prendergast (representing American Meter), Friedman (representing his firm, Joseph Friedman
 
 &
 
 Sons, International, Inc.), and representatives of Promprilad and American-Ukrainian Business Consultants, L.P. (“AUBC”) met in Kyiv (the current preferred transliteration of “Kiev”) and entered into the first of the agreements at issue here.
 

 The agreement provided for the establishment of a joint venture company, to be called Prompriladamco, in which the four signatories would become shareholders. Prompriladamco would work in conjunction with its principals to develop the market for American Meter products in the former Soviet Union and, most important for the purposes of this action, the agreement committed American Meter to the following obligations:
 

 9. AMCO shall grant Joint Venture PrompryladAmco exclusive rights to manufacture and install Meters within the former Soviet Union....
 

 10. AMCO shall grant Joint Venture PrompryladAmco exclusive rights to distribute the products manufactured by PrompryladAmco and all products manufactured by AMCO in the former Soviet Union....
 

 13. AMCO will deliver components and parts for Meters taking into account 90% assembly.
 

 14. PrompryladAmco (at the first stage) shall perform 10% of the work required to assembl[e] the Meters using components and parts delivered by AMCO.
 

 15. AMCO will deliver the components and parts for Meters by lots in containers, payments for the delivery being
 
 *DCCXXVII
 
 subject to at least a 90-day grace period.
 

 16. The number of the components and parts for Meters to be delivered to Ukraine shall be based on demand in the former Soviet Union.
 

 17. Orders for the components and parts for Meters, with the quantities and prices according to paragraph 16 above shall be an integral part of this Agreement.
 

 Agreement of 12/11/97 (Def.’s Mot. S.J. Ex. A).
 
 [2]
 

 After executing the agreement, the parties incorporated Prompriladamco in Ukraine, and Friedman became its Chief Executive Officer. The new corporation set out to obtain Ukrainian regulatory approval for American Meter products, which required bringing Ukrainian officials to the United States to inspect American Meter’s manufacturing process, and it sponsored a legislative measure that would give those products a competitive advantage in the Ukrainian market.
 

 On April 20, 1998, Friedman
 
 [3]
 
 and a representative of AUBC executed a second joint venture agreement for the purpose of marketing the gas piping products of Perfection Corporation, a wholly-owned subsidiary of American Meter. Again, the parties agreed to create and fund a corporation, this one to be called Amco Ukrser-vice, and American Meter committed itself to deliver, on credit, a level of goods based on demand in the former Soviet Union. Agreement of 4/29/98 (Def.’s Mot. S.J. Ex. B). The parties duly formed Amco Ukrservice, and Friedman became its Chief Executive Officer.
 

 By early summer, Prompriladamco and Amco Ukrservice had begun submitting product orders to American Meter. In late June or early July, however, American Meter President Harry Skilton effectively terminated the joint ventures by stopping a shipment of goods that was on its way to Ukraine and by refusing to extend credit to either Prompriladamco or Amco Ukrservice.
 
 See
 
 Skilton Dep. at 123-24 (Pis.’ Resp. (Defi’s Mot. S.J.) Ex. 5) (admitting that, as a result of his decisions, the project “died a natural death from then on out”). Finally, at a meeting on October 27, 1998, American Meter Vice-President Alex Tyshovnytsky informed Friedman that the corporation had decided to withdraw from Ukraine “due to unstable business conditions and eroding investment confidence in that country.” Letter from Tyshovnytsky to Friedman of 10/29/98 (Pis.’ Resp. (Def.’s Mot. S.J.) Ex. 41).
 

 On May 23, 2000, Prompriladamco and Amco Ukrservice filed parallel complaints claiming that American Meter had breached the relevant joint venture agreement by refusing to deliver the meters and parts that the plaintiffs could sell in the former Soviet Union. Prompriladamco’s complaint alleges that the breach caused it to lose $143,179,913 in profits between 1998 and 2003, and Amco Ukrservice claims lost profits of $88,812,000 for the same period. We consolidated the actions on August 18, 2000.
 

 II.
 
 American Meter’s Motion for Summary Judgment
 

 American Meter argues that summary judgment is warranted here because the
 
 *DCCXXVIII
 
 joint venture agreements are invalid under the CISG and Ukrainian law. It also contends that it is entitled to summary judgment because the plaintiffs’ claims for damages are based on nothing but “rank speculation.” Def.’s Mem. (Mot.S.J.) at 28. We consider each of these arguments in turn.
 

 A.
 
 The CISG
 

 The United States and Ukraine are both signatories to the CISG, which applies to contracts for the sale of goods where the parties have places of business in different nations, the nations are CISG signatories, and the contract does not contain a choice of law provision.
 
 Fercus, S.R.L. v. Palazzo,
 
 2000 WL 1118925, at *3 (S.D.N.Y. Aug. 8, 2000). American Meter argues that the CISG governs the plaintiffs’ claims because, at bottom, they seek damages for its refusal to sell them goods and that, under the CISG, the supply provisions of the agreements are invalid because they lack sufficient price
 
 [4]
 
 and quantity terms.
 

 Apart from a handful of exclusions that have no relevance here, the CISG does not define what constitutes a contract for the sale of goods.
 
 See
 
 CISG art. 2,
 
 reprinted in
 
 15 U.S.C.A.App., at 335 (West 1998). This lacuna has given rise to the problem of the Convention’s applicability to distributorship agreements, which typically create a framework for future sales of goods but do not lay down precise price and quantity terms.
 

 In the few cases examining this issue, courts both here and in Germany have concluded that the CISG does not apply to such contracts. In
 
 Helen Kaminski Pty. Ltd. v. Marketing Australian Products, Inc.,
 
 1997 WL 414137 (S.D.N.Y. July 23, 1997), the court held that the CISG did not govern the parties’ distributorship agreement, but it suggested in dictum that the CISG would apply to a term in the contract that addressed specified goods.
 
 Id.
 
 at *3. Three years later, Judge DuBois of this Court followed
 
 Helen Kaminski
 
 and held that the CISG did not govern an exclusive distributorship agreement, an agreement granting the plaintiff a 25% interest in the defendant, or a sales commission agreement.
 
 Viva Vino Import Corp. v. Farnese Vini S.r.l.,
 
 No. 99-6384, 2000 WL 1224903, at *1-2 (E.D.Pa. Aug. 29, 2000) (DuBois, J.). Two German appellate cases have similarly concluded that the CISG does not apply to distributorship agreements, which they termed “framework agreements,” but does govern sales
 
 *DCCXXIX
 
 contracts that the parties enter pursuant to those agreements.
 
 See
 
 OLG Dusseldorf, UNILEX, No. 6 U 152/95 (July 11, 1996),
 
 abstract available at
 
 http:// cisgw3.law.pace.edu/cases/960711gl.html; OLG Koblenz, UNILEX, No. 2 U 1230/91 (Sept. 17, 1993),
 
 text available at
 
 http:// cisgw3.law.pace.edu/cases/930917gl.html.
 

 American Meter argues that this line of cases is inapplicable here because the plaintiffs do not claim damages for breach of what it terms the “relationship” provisions of the joint venture agreements,
 
 [5]
 
 but instead seek to enforce an obligation to sell goods. In other words, American Meter claims that the supply and credit provisions are severable and governed by the CISG, even if the Convention has no bearing on the remainder of the two agreements.
 

 There are a number of difficulties with this argument, both in its characterization of the plaintiffs’ claims and its construction of the CISG. To begin with, Promprila-damco and Amco Ukrservice are not seeking damages for American Meter’s refusal to fill particular orders. Instead, they are claiming that American Meter materially breached the joint venture agreements when it refused to sell its products on credit, and as the ad damnum clauses of their complaints make clear, they seek damages for their projected lost profits between 1998 and 2003.
 
 See
 
 Compls. ¶¶ 6-7.
 

 American Meter’s construction of the CISG is equally problematic. It is premised on an artificial and untenable distinction between the “relationship” and supply provisions of a distributorship agreement — after all, what could be more central to the parties’ relationship than the products the buyer is expected to distribute? American Meter’s rhetorical view would also render it difficult for parties to create a general framework for their future sales without triggering the CISG’s invalidating provisions. Such a construction of the Convention would be particularly destabilizing, not to mention unjust, in the context of the joint venture agreements at issue here. On American Meter’s reading of the CISG, it could have invoked ordinary breach of contract principles if the plaintiffs had failed to exercise their best'efforts to promote demand for its products, all the while reserving the right to escape its obligation to supply those products by invoking Article 14’s price and quantity requirements. The CISG’s provisions on contract formation do not compel such an expectation-defeating result.
 

 We therefore join the other courts that have examined this issue and conclude that, although the CISG may have governed discrete contracts for the sale of goods that the parties had entered pursuant to the joint venture agreements, it does not apply to the agreements themselves.
 

 B.
 
 Ukrainian Law
 

 In the alternative, American Meter argues that the joint venture agreements are unenforceable because they violate a number of Ukrainian laws on the form of contracts for the sale and supply of goods. To resolve this question, we must first determine whether Ukrainian law indeed controls the validity of these agreements under Pennsylvania’s choice of law rules, which are applicable here pursuant to
 
 Klaxon Co. v. Stentor Electric Mfg. Co.,
 
 
 *DCCXXX
 
 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
 

 1.
 
 The Pennsylvania Choice-of-Law Regime
 

 In
 
 Griffith v. United Air Lines, Inc.,
 
 416 Pa. 1, 203 A.2d 796, 805, (1964), the Pennsylvania Supreme Court adopted a flexible choice of law rule that “permits analysis of the policies and interests underlying the particular issue before the court.” Our Court of Appeals has explained that the
 
 Griffith
 
 “methodology combines the approaches of both [the Restatement (Second) of Conflict of Laws] (contacts establishing significant relationships) and ‘interest analysis’ (qualitative appraisal of the relevant States’ policies with respect to the controversy).”
 
 Melville v. American Home Assurance Co.,
 
 584 F.2d 1306, 1311 (3d Cir.1978).
 

 In applying
 
 Griffith’s
 
 hybrid approach, we begin with an “interest analysis” of the policies of all interested states and then, based on the results of that analysis, proceed to characterize the case as a true conflict, false conflict, or unprovided-for case.
 
 [6]
 

 Lacey v. Cessna Aircraft Co.,
 
 932 F.2d 170, 187 n. 15 (3d Cir.1991);
 
 see also LeJeune v. Bliss-Salem, Inc.,
 
 85 F.3d 1069, 1071 (3d Cir.1996). A true conflict exists “when the governmental interests of
 
 both
 
 jurisdictions would be impaired if their law were not applied.”
 
 Lacey,
 
 932 F.2d at 187 n. 15. On the other hand, there is a false conflict “if only one jurisdiction’s governmental interests would be impaired by the application of the other jurisdiction’s law.”
 
 Id.
 
 at 187.
 

 When interest analysis identifies a false conflict, resolving the choice-of-law issue becomes relatively straightforward because we apply the law of the only interested jurisdiction.
 
 See, e.g., Kuchinic v. McCrory,
 
 422 Pa. 620, 222 A.2d 897, 899-900 (1966) (applying Pennsylvania law where Georgia was not a “concerned jurisdiction”);
 
 Griffith v. United Air Lines, Inc.,
 
 416 Pa. 1, 203 A.2d 796, 807 (1964) (applying Pennsylvania law where Pennsylvania had an interest in having its law applied but Colorado had no such interest).
 

 The resolution of a true conflict is a more complex process. In an action for breach of contract, we both weigh the competing governmental interests and apply Sections 6 and 188 of the Restatement (Second).
 
 Melville,
 
 584 F.2d at 1313-14.
 

 2.
 
 Sources of Law
 

 While the plaintiffs and American Meter agree that ordinary breach of contract principles would govern the plaintiffs’ claims under Pennsylvania law, they dispute whether the joint venture agreements are invalid under Ukrainian law and, if so, what governmental interests any invalidating laws would serve. We therefore begin with a discussion of Pennsylvania’s interest in this action and then turn to the more difficult problems that Ukrainian law presents, first examining the statutes that American Meter has identified and then predicting whether a Ukrainian court would apply them in this case. Finally, after we have isolated any applicable statutory provisions, we will consider Ukraine’s interest in their enforcement.
 

 (a)
 
 Pennsylvania Law
 

 At the threshold, we note that American Meter has disputed whether Pennsylvania has
 
 any
 
 interest at all in the enforcement of the joint venture agreements because
 
 *DCCXXXI
 
 they were negotiated in Ukraine, written in the Ukrainian language, and provide for the creation of Ukrainian corporations. This argument does not withstand close scrutiny because the record amply demonstrates the important contacts between Pennsylvania and both the parties to the joint venture agreements and the obligations those agreements created. All of the American Meter employees who hatched the Ukrainian project worked from corporate headquarters in Horsham, Pennsylvania, and most important of all, the parties to the joint venture agreements contemplated that American Meter would oversee the project, extend credit, and arrange for the shipment of goods from its offices here.
 
 See
 
 Restatement (Second) of Conflict of Laws § 188(2) & cmt. e (1971) (describing contacts with the transaction and the parties that are relevant in identifying jurisdictions with an interest in the case).
 

 Not only does Pennsylvania have significant contacts with both the parties and the joint ventures, but enforcement of the joint venture agreements would advance the Commonwealth’s general interests. As American Meter grudgingly concedes, the vindication of contractual parties’ legitimate expectations creates a stable business environment and thereby helps the Commonwealth achieve its commercial potential.
 
 Myers v. Commercial Union
 
 As
 
 surance Co.,
 
 485 A.2d 1113, 1117 (Pa.1984). Finally, although American Meter asserts that the plaintiffs’ claims for damages are too speculative, it does not dispute that, as an abstract proposition, the joint venture agreements create enforceable obligations under Pennsylvania law.
 

 (b)
 
 Ukrainian Law
 

 In the years since it achieved independence, Ukraine has developed a complex and, from an outsider’s perspective, exceptionally murky body of law governing the form and content of international commercial agreements.
 
 [7]
 
 American Meter contends that the joint venture agreements are invalid under three separate statutory schemes and that each advances identifiable and significant state interests.
 

 1.
 
 “Regulations on the Supply of Industrial Goods” (1988)
 

 On July 25, 1988, the USSR Council of Ministers promulgated “Regulations on the Supply of Industrial Goods,” which remained effective in Ukraine after the collapse of the Soviet Union pursuant to a general reception statute that the Verkov-na Rada, the Ukrainian Parliament, enacted in 1991. Under Paragraph 19 of the Regulations, a contract for the supply of goods must identify the goods to be delivered, the time of delivery, and their price, quantity, and quality. Regulations ¶ 19 (Gusyev AffApp. Ex. 2). American Meter’s Ukrainian legal expert has opined that the Regulations were still in force in 1998 and that the joint venture agreements are invalid because their supply provisions lack the terms detailed in Paragraph 19. The plaintiffs’ legal expert, however, contends that the Regulations have no relevance here because they were enacted to regulate the Soviet Union’s internal market and, in any event, never applied to joint venture agreements. In support of this interpretation, the plaintiffs’ expert points to Paragraph 2, which provides that the Regulations cover “the relations among state-owned and cooperative and other social organizations regard
 
 *DCCXXXII
 
 ing the supply of goods (including the supply of ... imported products in the internal market, unless otherwise provided by law).... ” Batyuk Deck Ex. 9 ¶ 2.
 

 Although American Meter solicited a supplemental affidavit from its Ukrainian expert, he declined to challenge the plaintiffs’ expert’s views on the Regulations. In view of the fact that the plaintiffs’ contentions appear to have textual support— and in the absence of a counter-argument from American Meter — we must conclude that the plaintiffs’ view carries the day on this issue and that the Regulations are inapplicable here.
 

 2.
 
 “Provisions on the Form of Foreign Economic Agreements” (1995)
 

 American Meter’s legal expert has also brought to our attention the “Provisions on the Form of Foreign Economic Agreements,” which the Ukrainian Ministry of Foreign Economic Relations and Trade enacted in 1995. The Provisions’ preamble states that they “are applicable when concluding sale (purchase) agreements on goods (services, performance of work) and barter agreements among Ukrainian and foreign economic subjects irrespective of their property form and type of activities.”
 

 Agreements governed by the Provisions must,
 
 inter alia,
 
 identify the goods to be sold and specify their quantity and quality. Provisions § 1.3 (Gusyev AffApp. Ex. 6). American Meter contends that the joint venture agreements are invalid under the Provisions because they manifestly do not satisfy these requirements. However, as the plaintiffs’ legal expert has contended, the Provisions offer no textual support for American Meter’s position. Indeed, the text of the Provisions suggests that they do not regulate joint venture agreements and were instead enacted to regularize contracts for the sale of goods and provision of services. Not only does the preamble state that the Provisions are applicable to sale and barter agreements, but several sections of Part One clearly contemplate that its requirements will apply to contracts for goods and services.
 
 See, e.g.,
 
 § 1.3 providing that the “Subject of Agreement” section of a contract must “define what goods (services, works) one of the counterparts is required to supply”; §§ 1.5 & 1.8 (mandating that a contract specify “basic conditions of goods supply (acceptance of performed works or services)” and “conditions of acceptance (handing-over) of goods (works, services)”).
 

 Finally, the plaintiffs’ construction of the Provisions gains support from the framers’ apparent intention that they be read
 
 in pari materia
 
 with Ukraine’s Foreign Economic Activities Law (“FEAL”).
 
 See
 
 Preamble (providing that foreign economic agreements must be made pursuant to the FEAL); § 3 (listing the FEAL among “legal and normative acts of Ukraine, which regulate the form, procedures of conclusion and performance of foreign economic agreements (contracts)”). Because the FEAL recognizes joint venture agreements,
 
 see
 
 FEAL art. 6 para. 12 (Gusyev AffApp. Ex. 4) (providing that “[a] foreign economic agreement (contract) on joint venture creation shall be governed by the law of the country in which the joint venture is created and officially registered”), it is improbable that the Foreign Ministry intended the 1995 enactment to invalidate such agreements, which create long-term relationships and are unlikely to contain price, quantity, and delivery terms that would be sufficiently precise to satisfy the Provisions.
 

 In view of this textual evidence, we conclude that although the Provisions would likely govern a particular sales contract executed pursuant to a joint venture agreement, they do not bear on the validity of the joint venture agreement itself.
 
 [8]
 

 
 *DCCXXXIII
 
 3.
 
 Foreign Economic Activity Law (1991)
 

 Finally, American Meter invites us to consider whether the Ukrainian courts would invalidate the joint venture agreements under Article 6 of the FEAL. At the time the parties entered into these agreements, Article 6 required any contract between a Ukrainian entity and a foreign entity to be executed by two representatives of the Ukrainian signatory, and neither Promprilad nor AUBC complied with this rule.
 

 Ukraine’s two-signature rule was the final incarnation of a policy with deep roots in the history of the Soviet command economy. According to a Stalin-era decree, any contract between a foreign entity and a Soviet foreign trade organization (“FTO”) that was executed in Moscow required the signatures of the FTO’s chairman or deputy as well as a person possessing the chairman’s power of attorney. Contracts executed abroad required the signatures of two persons with powers of attorney. The government published the names of FTO officials with the power to sign such agreements in a foreign trade journal.
 
 See
 
 Anthony Gardner, Note,
 
 The Doctrine of Separability in Soviet Arbitration Law: An Analysis of
 
 Sojuzneftexport v. JOC Oil Co., 28 Colum. J. Transnat’l L. 301, 322 & n. 104 (1990); Batyuk Decl. ¶ 19. A 1978 enactment of the USSR Council of Ministers, “On the Procedure for Signing Foreign Trade Transactions,” retained the two-signature rule, and according to a late Soviet court decision, failure to comply with the rule rendered the contract voidable at the instance of the FTO.
 
 See
 
 Gardner,
 
 supra,
 
 at 322 n. 104,
 
 quoting Sojuzneftexport v. JOC Oil Co.,
 
 40 Int’l Arb. Rep. B-44 (1989).
 

 One writer has suggested that the purpose of the two-signature rule was “to protect foreign trade organizations from being bound by improvident contracts concluded by junior officials in return for kickbacks.” Gardner,
 
 supra,
 
 at 322 n. 104. The plaintiffs’ legal expert has offered the more sinister, but not incompatible, explanation that “the role of the second signatory generally was to exercise control over the first signatory in the interests of the KGB.” Batyuk Decl. ¶ 19.
 

 Whatever its purpose may have been, one might have thought that the two-signature rule would have disappeared after 1990 along with the other legal trappings of the Soviet economy. In 1991, however, the Verkovna Rada enshrined the two-signature rule in the FEAL:
 
 [9]
 

 In the event that the foreign economic agreement is signed by an individual, signature of such individual shall be required. The foreign economic agreement shall be signed on behalf of other subjects of economic activity by two persons: one person who is authorized to sign by virtue of his/her position, in accordance with his/her founding documents, and another person who is solely authorized to sign on the basis of the power of attorney issued under the hand of the directors of the subject of foreign economic activity, unless otherwise provided by founding documents.
 

 FEAL art. 6 para. 2 (Gusyev AffiApp. Ex. 5) (as amended and restated on March 14, 1995 but before amendment of October 21, 1999).
 

 
 *DCCXXXIV
 
 Ukrainian businesses, however, did not always comply with the two-signature rule, and a dispute between a Ukrainian pharmaceutical firm and its American trading partner soon forced the courts and Ver-kovna Rada to clarify the rule’s place in Ukrainian commercial law. Armor Pharmaceutical filed a claim in the Ukrainian Arbitration Court against Lubnipharm for the return of partially unpaid pharmaceuticals. On November 22, 1996, the Supreme Arbitration Court of Ukraine (“SACU”) invalidated the original contracts on the ground that two representatives of Lub-nipharm did not execute them, but on January 11, 1997 the Arbitration Board of the SACU declared that failure to comply with the two-signature rule was not automatic grounds for invalidation and overturned the decision of November 22nd. The Plenary Meeting of the SACU upheld the Arbitration Board’s decision, and the dispute ultimately landed in the Constitutional Court of Ukraine.
 
 See
 
 Const. Ct. Ukraine, No. 1767, Case No. 1-17/98, at 2-3 (Nov. 26, 1998) (Gusyev AffApp. Ex. 8) (providing procedural history of the case). In a decision dated November 26,1998, the Court somewhat ambiguously stated that the two-signature rule was “obligatory” but also held that failure to comply
 
 “may
 
 be the basis for invalidation of the foreign economic agreement in court as not meeting the requirements of laws or international agreements of Ukraine.”
 
 Id.
 
 (emphasis added).
 

 The Verkovna Rada and SACU swiftly acted to blunt the Constitutional Court’s ruling. The Deputy Prosecutor General of Ukraine filed a submission in the Supreme Arbitration Court to review the Lubnip-harm case, but in a ruling issued June 11, 1999, the SACU affirmed its earlier decision to uphold the Lubnipharm contracts. Seizing upon the Constitutional Court’s statement that failure to comply with the two-signature rule
 
 may
 
 be a basis for invalidating a contract, the Court concluded that it retained the discretion to affirm non-conforming contracts and that invalidation would be inappropriate in the Lub-nipharm case because both parties had actually performed under the contracts. The Court also noted that, in any event, the Constitutional Court’s decision did not state whether it had retroactive effect. SACU, No. 04-0/1-7/28, at 2-3 (June 11, 1999) (Batyuk Decl. Ex. 14).
 
 [10]
 
 Four months later, the Verkovna Rada at last repealed the two-signature rule.
 
 See
 
 Amend, of Art. 6 (Oct. 21, 1999) (Batyuk Decl. Ex. 13).
 

 Apparently, however, neither the SACU’s narrow construction of the Constitutional Court’s ruling nor the amendment to Article 6 has dimmed the lower court’s willingness to invoke the two-signature rule in cases involving contracts executed before the repeal. In 2001, for example, Judge Zyrnov of the Kyiv City Commercial Court
 
 [11]
 
 relied upon the rule to nullify a lease and credit agreement between a
 
 *DCCXXXV
 
 Ukrainian corporation and Fortis Bank of the Netherlands, despite the fact that the Bank had rendered performance.
 
 See
 
 Kyiv City Commercial Ct., No. 9/188-01 (Aug. 31, 2001) (Gusyev Suppl. Aff. Ex. A).
 

 Predicting another judicial system’s resolution of an issue is always a perilous business,
 
 [12]
 
 but we must conclude there is at least a possibility that a Ukrainian court would invalidate the joint venture agreements on the ground that the Ukrainian parties did not comply with the two-signature rule. The Constitutional Court has confirmed that the courts may invalidate a contract for failure to comply with the rule, and while the SACU has shown its willingness to uphold contracts where (as here) there has been performance, the Fortis Bank decision shows that the lower courts are still prepared to enforce the rule even in circumstances where the SACU might demur.
 

 4.
 
 Characterization of the Conflict of La%v Problem
 

 Our conclusion that the courts of Pennsylvania and Ukraine might diverge in their treatment of the joint venture agreements merely poses the conflict of law problem without resolving it. In order to determine whether this case involves a false or true conflict, we must first determine what, if any, governmental interests the two-signature rule advances.
 

 American Meter contends that Ukraine has an interest in the retroactive enforcement of the rule because it protects Ukrainians who enter into contracts with foreigners and promotes certainty, predictability, and uniformity in commercial relationships. Defl’s Reply (Def.’s Mot. S.J.) at 18. American Meter’s “argument from paternalism” would bear close scrutiny if we were resolving this conflict of law problem in 1992. After all, the plaintiffs’ legal expert had stated that the Verkovna Rada included the rule in the FEAL as a sop to legislators who opposed economic liberalization, and perhaps its proponents believed that requiring two signatures on contracts would protect Ukrainian naifs from more commercially sophisticated (and capitalism-hardened) foreigners.
 
 [13]
 
 Now that the Verkovna Rada has repealed the two-signature rule, however, we cannot conclude on the record before us that its continued enforcement advances any
 
 current
 
 social, political, or economic interest of Ukraine.
 

 Turning to American Meter’s “argument from commercial certainty,” we note that this articulation of Ukraine’s interest in the rule remains plausible despite the repeal. A hard-and-fast policy that all foreign economic agreements executed between the enactment of the FEAL and the statute’s 1999 amendment must comply with the two-signature rule would — like any bright-line rule — have the advantage of letting parties know exactly where they stand. But as the recent decisions of the SACU and Kyiv Commercial Court underscore, the difficulty with this argument is that the two-signature rule is not so much a bright-line rule as it is a controversial repository of judicial discretion that allows courts to invalidate contracts for any reason — or perhaps for no reason at all. Under these circumstances, we cannot discern how the two-signature rule advances any of the procedural or commercial advantages that Ukraine would derive from a
 
 *DCCXXXVI
 
 predictable body of law governing the validity of contracts.
 

 To summarize, we have concluded that Pennsylvania and Ukraine both have significant relationships with the parties and the transactions. Moreover, we have found that Pennsylvania has a general interest in the enforcement of contracts, and it goes without saying that this interest would be compromised if a Pennsylvania corporation could defeat the expectations of its trading partners in the manner American Meter has proposed here. Finally, we have concluded that American Meter has not identified any governmental interest of Ukraine in the continued enforcement of the repealed two-signature rule.
 
 [14]
 

 Because our analysis reveals that Pennsylvania’s interest would be harmed by applying Ukraine’s law, but that no identified Ukrainian interest will be impaired by enforcing these contracts, this case presents a false conflict. Under the Pennsylvania choice-of-law regime, Pennsylvania law therefore governs the plaintiffs’ claims, and American Meter is not entitled to summary judgment on the ground that the contracts are invalid under Ukrainian law.
 

 C.
 
 Compensatory Damages
 

 American Meter finally argues that, even if the joint venture agreements are enforceable, the plaintiffs’ claims for damages are too speculative to warrant submission to a jury because they are nothing more than extrapolations from sales agreements that were never valid under Ukrainian law.
 

 In Pennsylvania, a plaintiff seeking damages for anticipated lost profits must offer evidence providing a basis for estimating them “with reasonable certainty.”
 
 Exton Drive-In, Inc. v. Home Indemnity Co.,
 
 436 Pa. 480, 261 A.2d 319, 324 (1969);
 
 see also Jahanshahi v. Centura Devel. Co.,
 
 816 A.2d 1179, 1184 (Pa.Super.2003) (damages for future lost profits “may not be awarded when the evidence leaves the trier of fact without any guideposts except his or her own speculation”). Although a new business with no record of profitability cannot usually satisfy this standard,
 
 see, e.g., Exton,
 
 261 A.2d at 324-325, the Pennsylvania Superior Court has carved out an exception for a new business that can show a “significant interest” in its product or service before the contract breach occurred.
 
 Delahanty v. First Pa. Bank, N.A.,
 
 318 Pa.Super. 90, 464 A.2d 1243, 1260 (1983),
 
 citing Gen’l Dynafab, Inc. v. Chelsea Indus., Inc.,
 
 301 Pa.Super. 261, 447 A.2d 958, 960 (1982). Moreover, the Superior Court has cautioned that “it is better that the jury hear the evidence of future lost profits and decide its weight
 
 *DCCXXXVII
 
 than allow the court to exclude the evidence entirely.”
 
 Id.
 

 There is no question that Promprila-damco and Amco Ukrservice were new businesses operating in an unstable commercial environment, but for summary judgment purposes the record sufficiently shows that Ukrainian purchasers demonstrated their interest in American Meter’s products during the brief lifespan of the joint ventures. Russo and representatives of Prompriladamco attended an industrial trade show in Kyiv in July of 1998, and Prendergast reported that interest in American Meter’s products at the trade show was “overwhelming.” Mem. of Pren-dergast to Diasio of 7/30/98, at 5007 (Pis.’ Resp. (Defi’s Mot. S.J.) Ex. 13).
 

 Moreover, the plaintiffs entered into six sales contracts with Ukrainian municipalities and gas companies in June and July of 1998. American Meter argues that these agreements have no evidentiary value because they violated a 1997 decree of the Ukraine Cabinet of Ministers granting a state firm, Ukrgas, the exclusive right to purchase and produce gas meters. However, the plaintiffs’ legal expert has declared that on July 30, 1998, the Council of Ministers rescinded the decree, thereby making it possible for purchasers and suppliers to re-execute any agreements entered during the pendency of the decree. Batyuk Deck ¶¶ 32-33.
 

 Viewing this record in the light most favorable to the plaintiffs, we conclude that summary judgment would be premature because there remain material issues of fact concerning the demand for American Meter’s products and the extrapolative value of the six sales contracts.
 
 [15]
 

 III.
 
 Prompriladamco’s Partial Motion for Summary Judgment
 

 American Meter’s president, Harry Skilton, has candidly acknowledged that he terminated the Ukrainian project in 1998 after refusing to extend credit or ship goods. Skilton Dep. at 125,159-63,172-73 (Pis.’ Resp. (Def.’s Mot. S.J.) App. Ex. 5). On the basis of this admission, Promprila-damco contends that it is entitled to summary judgment on the issue of liability because there is no genuine issue of material fact as to whether American Meter breached the joint venture agreements. American Meter responds that even if its conduct would constitute a breach of the agreement there remains a genuine issue of material fact as to whether Prendergast had actual or apparent authority to execute such a contract in his capacity as the corporation’s agent.
 

 A.
 
 Prendergast’s Actual Agency Authority
 

 We begin with Prendergast’s actual agency authority. Pennsylvania law recognizes two forms of actual authority: express and implied. Express actual authority is “directly granted by the principal to bind the principal as to certain matters,” while implied actual authority exists where the agent’s acts “are necessary, proper and usual in the exercise of the agent’s express authority.”
 
 Bolus v. United Penn Bank,
 
 363 Pa.Super. 247, 525 A.2d 1215, 1221 (1987).
 

 While it is true that Prendergast was actively identifying and then negotiating with potential Ukrainian partners in 1997, Harry Skilton has averred that he never approved or was even aware of the Prom-priladamco agreement. He also claims
 
 *DCCXXXVIII
 
 that, pursuant to a longstanding resolution of the Board of Directors, neither Pren-dergast nor Watson (Prendergast’s immediate supervisor) could have made the multimillion dollar commitment contemplated in the agreement without Board approval. Skilton Aff. ¶¶ 2-7 (Def.’s Resp. (Pl.’s Mot. S.J.) Ex. E). At his deposition, moreover, Skilton stated that he had only authorized Watson and Prendergast to secure certification for American Meter’s products and create “standby” or “cubbyhole” joint ventures with local companies that could have become active if the corporation had decided to move forward with the Ukrainian project. Skilton Dep. at 44-45, 90 (Def.’s Resp. (Pl.’s Mot. S.J.) Ex. B).
 

 Jim Diasio, who gradually assumed Watson’s responsibilities as Chief Financial Officer in 1998, acknowledges that he was aware of Friedman’s and AUBC’s lobbying and marketing efforts and that he knew Promprilad and American Meter had created a “standby” joint venture company. However, he denies any knowledge of the joint venture agreement, and he claims that there was not even a copy of the agreement in Watson’s files. Diasio Aff. ¶¶ 6-7, 10, 14 (Defs Resp. (Pl.’s Mot. S.J.) Ex. C).
 

 Finally, American Meter’s Assistant Secretary and custodian of corporate seals, C. Kelsey Brown, avers that the rubber stamp Prendergast used to authenticate his signature on the agreement is not an official corporate seal, that he never issued it to Prendergast, and that he has never even seen it. Brown Aff. ¶ 4-7 (Def.’s Resp. (Pl.’s Mot. S.J.) Ex. I.)
 

 Viewed in the light most favorable to American Meter, this record shows that there is a genuine issue of material fact as to whether Prendergast had actual authority to enter into the joint venture agreement.
 

 B.
 
 Prendergast’s Apparent Agency Authority
 

 American Meter also argues that there is a disputed question of fact as to whether Prendergast had apparent authority to execute the Prompriladamco agreement. Apparent authority exists under Pennsylvania law
 

 where a principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent the authority he or she purports to exercise. The third party is entitled to believe the agent has the authority he purports to exercise only where a person of ordinary prudence, diligence and discretion would so believe. Thus, a third party can rely on the apparent authority of an agent when this is a reasonable interpretation of the manifestations of the principal.
 

 Joyner v. Harleysville Ins. Co.,
 
 393 Pa.Super. 386, 574 A.2d 664, 667-668 (1990) (citations omitted).
 

 Whether the doctrine of apparent authority applies in a given case is almost never suited for summary judgment because it closely turns on both the principal’s manifestations and the reasonableness of the third party’s beliefs.
 
 Gizzi v. Texaco, Inc.,
 
 437 F.2d 308, 310 (3d Cir.1971). The only person involved in this action who conceivably could have been deceived into thinking that Prendergast could sign the joint venture agreement was Simon Friedman, and what he knew about Prendergast’s authority is very much an open question. Prendergast testified that he told Friedman he had authority to negotiate and execute the joint venture agreements, but American Meter plausibly counters that Friedman’s own correspondence with Diasio betrays his awareness that Prendergast was not unilaterally calling the shots at American Meter. Pren-dergast Dep. at 44-45 (Pl.’s Suppl. Reply
 
 *DCCXXXIX
 
 (Pl.’s Mot. S.J.) Ex. A); Letters from Friedman to Diasio of 7/22/98 & 8/12/98 (Def.’s Resp. (Pl.’s Mot. S.J.) Exs. K & L) (notifying Diasio that he was awaiting American Meter’s decisions on various matters).
 

 On this record, therefore, summary judgment would be inappropriate because Prendergast’s apparent authority is a highly consequential question of disputed fact that must await trial.
 

 Conclusion
 

 We therefore conclude that American Meter is not entitled to summary judgment. The CISG does not govern the joint venture agreements, and even though it is possible a Ukrainian court would refuse to enforce these agreements, Pennsylvania law governs their validity because this case presents a “false conflict” under Pennsylvania’s well-settled choice of law rules.
 

 Finally, the plaintiffs have presented sufficient evidence in support of their claims for projected lost profits to withstand summary judgment. We also deny Prompriladamco’s motion for summary judgment because there is a genuine issue of material fact as to whether C. Douglas Prendergast had actual or apparent authority to sign the joint venture agreement on American Meter’s behalf.
 

 An Order embodying these holdings follows.
 

 ORDER
 

 AND NOW, this 29th day of March, 2004, upon consideration of defendant American Meter Company’s motion for summary judgment (docket entry # 62) and plaintiffs Ameo Ukrservice and Prom-priladamco’s response thereto, and Prom-priladamco’s motion for partial summary judgment (docket entry # 66) and American Meter’s response thereto, and in accordance with the accompanying Memorandum, it is hereby ORDERED that:
 

 1. Defendant’s motion for summary judgment is DENIED;
 

 2. Prompriladamco’s motion for summary judgment is DENIED; and
 

 3. By April 12, 2004, the parties shall CONFER and JOINTLY REPORT on (a) what discovery, if any, remains to be completed before trial and (b) when counsel would be available for trial after September 1, 2004.
 

 [1]
 

 . At the time, Friedman was working as a consultant for American Meter.
 

 [2]
 

 . The agreements are in Ukrainian, and for the purpose of resolving these motions, we rely on American Meter’s certified translations.
 

 [3]
 

 . Friedman signed the agreement as a representative of both his own firm and American Meter, which strenuously denies that Friedman could enter into contractual relations on its behalf.
 

 [4]
 

 . It is not entirely clear whether an open price term invalidates a contract for the sale of goods under the CISG. Article 14(1) of the Convention provides that a proposal is sufficiently definite to constitute an offer if "it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price.” However, Article 55 states that "[w]here a contract has been validly concluded but does not expressly or implicitly fix or make provision for determining the price, the parties are considered ... to have impliedly made reference to the price generally charged at the time of the conclusion of the contract for such goods sold under comparable circumstances in the trade concerned.” The relationship between Articles 14 and 55 is the subject of a long-simmering academic controversy. Some commentators claim that Article 55 obviates the need for a specific price term. Others argue that this approach begs the question whether the parties have "validly concluded” a contract — a question that can only be answered by reference to Article 14 — and surmise that Article 55 applies where a Contracting State has opted out of the CISG’s provisions on contract formation.
 
 See generally
 
 Paul Amato,
 
 U.N. Convention on Contracts for the International Sale of Goods
 
 — The
 
 Open Price Term and Uniform Application: An Early Interpretation by the Hungarian Courts,
 
 13 J.L. & Com. 1, 9-11 (1993) (discussing the controversy and comparing the views of Professors Farnsworth and Hon-nold).
 

 [5]
 

 . In this category, American Meter would place terms dealing with such matters as quality control, the use of registered trademarks, and the parties' advertising and marketing obligations.
 

 [6]
 

 . An unprovided-for case arises when neither jurisdiction's interests would be impaired if their law were not applied.
 

 [7]
 

 . Five years ago, Mr. Justice Colman of the Queen’s Bench traversed some of the ground we cover here and wearily concluded that, "I am bound to say that I have found this an exceptionally obscure area of Ukrainian law which appears to be very far from settled.”
 
 Azov Shipping Co.
 
 v.
 
 Baltic Shipping Co. (No. 3), 2
 
 Lloyd’s Rep. 159, 172 (1999).
 

 [8]
 

 . Of course, it is possible that the Ukrainian courts would sever the supply provisions of
 
 *DCCXXXIII
 
 the joint venture agreements and apply the Provisions to them. However, American Meter has not provided us with any evidence that the Ukrainian courts have taken this approach to joint venture or other "framework” agreements.
 

 [9]
 

 . According to the plaintiffs’ legal expert, the inclusion of the two-signature rule in the FEAL was a compromise between advocates of economic liberalization and their opponents, who sought to retain the state's monopoly on foreign trade. Batyuk Decl. ¶ 19.
 

 [10]
 

 . An anonymous commentary, which the plaintiffs' legal expert included in the exhibits supporting his declaration and to which defendants have not taken exception, notes that the SACU’s decision accorded with the position of the International Commercial Arbitration Court of the Chamber of Commerce and Industry of Ukraine as well as another case:
 

 [I]n one similar case, payment under a contract was made under five specifications out of six. A dispute arose with respect to the last specification. The defendant tried to change the subject matter of the action, and file a counter claim, seeking the invalidation of the entire contract specifically due to the absence on the contract of the second signature of the responsible individual. However, the court dismissed such a claim.
 

 Commentary on SACU, No. 04-0/1-7/28 (June 11, 1999), at 4 (Batyuk Decl. Ex. 14).
 

 [11]
 

 . According to American Meter's legal expert, the Arbitration Courts are now called Commercial Courts. Gusyev Aff. ¶ 26.
 

 [12]
 

 . As Judge Sloviter has noted, our own Court of Appeals has made incorrect "Erie guesses” in a “not insignificant” number of cases. Dolores K. Sloviter,
 
 A Federal Judge Views Diversity Through the Lens of Federalism,
 
 78 Va. L.R. 1671, 1679-80 (1992).
 

 [13]
 

 . In any event, the enforcement of the two-signature rule in this case would not advance any such paternalistic policy because the Ukrainian corporations want to enforce the joint venture agreements and it is American Meter who seeks the rule’s shelter.
 

 [14]
 

 . Our conclusion that the two-signature law no longer advances an articulable governmental interest is based strictly on the record that the parties have adduced after a protracted period of discovery and after soliciting the assistance of experts on Ukrainian law. The Restatement observes that "[ejveiy rule of law, whether embodied in a statute or in a common law rule, was designed to achieve one or more purposes.” Restatement (Second) of Conflicts of Law § 6 cmt. e (1971). In most cases the court can honor this principle and identify the relevant governmental interests by engaging in a bit of 1-L law and economics theorizing. See,
 
 e.g. Reyno v. Piper Aircraft Co.,
 
 630 F.2d 149, 167-68 (3d Cir.1980) (concluding that Pennsylvania's strict liability regime favors consumer safety, while Scotland's retention of traditional negligence rules in the product liability area encourages industry to locate within its borders). However, in a case involving an unfamiliar legal regime where the choice of law question arises in the context of a motion for summary judgment, the court is entirely dependent on the parties’ submissions. While the Ukrainian courts very well may have developed a nuanced approach to the retroactive application of the two-signature rule that embodies and advances some governmental interest, American Meter simply has not shown it.
 

 [15]
 

 . American Meter is free to argue that the extrapolative value of these sales must reflect the likelihood that the plaintiffs’ putative trading partners would have declined to re-execute the contracts after July 30, 1998 or would have been unable to pay for the products they agreed to purchase.